J-S32017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 633 MDA 2023 |

Appeal from the Order Entered March 29, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000251-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: T.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 634 MDA 2023 |

Appeal from the Order Entered March 29, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000252-2021

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:        **FILED: NOVEMBER 6, 2023**

In this consolidated matter, D.F. (Mother) appeals the orders of the York County Court of Common Pleas (the juvenile court) to change the permanency goal of the dependency proceedings involving Mother's two children: five-year-old daughter, W.P.; and three-year-old son, T.P.  The orders changed the primary goal of the family's permanency plan from reunification to adoption, pursuant to the Juvenile Act.  ***See generally*** 42 Pa.C.S.A. § 6351.

On appeal, Mother argues that the juvenile court abused its discretion, because the record demonstrates Mother's substantial progress under the permanency plan and thus does not support a goal change. After careful review, we conclude that the court acted within its broad discretion, and we affirm.

The relevant factual and procedural history is as follows: The family came to the attention of the York County Office of Children, Youth and Families (the Agency) in May 2021. Mother was involved in a car accident in the early hours of the morning with her daughter in the car. It was later determined that Mother had been driving under the influence of drugs. The Agency initially created a safety plan involving a kinship placement, but when the plan failed several weeks later, the Agency filed dependency petitions. In June 2021, the juvenile court adjudicated the Children dependent and placed them in the home of a foster parent.

During the 21 months between the dependency adjudication in June 2021 and the goal change hearing in March 2023, the juvenile court acknowledged that Mother made significant progress with the reunification plan; however, in the months immediately leading up to the goal change decision, the court also concluded that Mother's progress had plateaued. The record provides the following timeline:

- The November 2021 permanency review order noted that Mother had begun substance abuse treatment, was employed, had attended supervised visitation with the Children, and that she resolved her criminal case by pleading guilty to

DUI, for which she was sentenced to 270 days of house arrest and five years of probation.

- In February 2022, Father died from a suspected drug overdose.

- In March 2022, Mother had tested positive on a drug screen and thus violated a condition of her sentence. Although she was briefly incarcerated, she soon returned to house arrest.

- In its May 2022 permanency review order, the court determined that Mother's progress was moderate. Mother tested negative for illicit substances, maintained her employment, and visited the Children.

- In August 2022, the supervised visits were moved to Mother's home.

- By October 2022, Mother had maintained housing and employment; her drug test results were "appropriate;" and she did not miss any visits. The Agency indicated that Mother had made significant progress, and thus was not immediately seeking termination of Mother's rights, even though the Children had been in placement for 15 months.

- In December 2022, however, Mother was placed back on house arrest after she tested positive for phentermine, a prescription weight-loss drug. Mother claimed she received the pill from a friend without realizing that it was a prescription drug. As a result of this positive test, the Agency did not move forward with its plan to afford Mother unsupervised visits or overnight visits with the Children. Around this time, Mother was prescribed Adderall for ADHD [(Attention-Deficient/ Hyperactivity Disorder)].

- In January 2023, Mother's visits returned to fully supervised. The court heard testimony that Mother's boyfriend was living in the home, which was particularly problematic because the boyfriend had a criminal history for drug offenses. Mother had missed three visits. The service provider,

Catholic Charities, was also concerned that Mother's levels of Adderall would fluctuate and were not consistent. Mother had also initially tested positive for methamphetamines, but one of those tests was ultimately deemed a false positive; another test was awaiting confirmation.

- In March 2023, the court learned that Mother had again tested positive for methamphetamines, but that these tests were confirmed and were not false positives. The court further concluded that Mother did not sufficiently course-correct since the January 2023 permanency review hearing, as we explain in detail *infra*.

Although the Children's guardian *ad litem* (GAL) opposed the goal change, the court nevertheless determined that reunification could not be achieved within a reasonable timeframe.[1] Technically speaking, the court kept concurrent goals in the permanency plan, but the court changed the primary goal to adoption and the secondary goal to reunification.

Mother timely filed this appeal. She presents the following issues for our review:

1. Did the trial court err as a matter of law and/or abuse its discretion in accepting the report and testimony of the caseworker despite testimony from other sources that disputed that caseworker and the caseworker's own testimony on [the] failure to investigate the stated concerns?

2. Did the trial court err as a matter of law and/or abuse its discretion when it changed the court ordered goal from reunification to adoption without clear and

---

[1] Given that the GAL was not in agreement with the juvenile court, we are disappointed that the GAL did not file a brief to assist us in this appeal.

> convincing evidence that a change of goal would serve the best interests of the Children?

Mother's Brief at 5.

We address Mother's issues contemporaneously.[2] We begin by observing the relevant standard of review. "[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted).

We have explained:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S.A. §§ 6301-6365], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take

---

[2] As an initial matter, we note that Mother did not divide the argument section of her brief into as many parts as there are questions to be argued. We remind Mother that such formatting is required by Pa.R.A.P. 2119(a) and that circumvention of the Rules of Procedure could result in waiver. Here, Mother folds her first argument regarding the court's credibility findings into her second, primary argument that the court's decision to change the permanency goal lacked evidentiary support.

precedence over **all** other considerations, including the rights of the parents.

**In re A.B.,** 19 A.3d 1084, 1088 (Pa. Super. 2011) (citing **In re N.C.**, 909 A.2d 818, 823 (Pa. Super. 2006)) (further citations and footnotes omitted) (emphasis original).

Although the relevant statutory provisions of the Juvenile Act do not reference the phrase "goal change," the phrase has become a term of art. **R.J.T.**, 9 A.3d at 1183, n.6. The concept of a "goal change" is consistent with 42 Pa.C.S.A. § 6351(g), which requires the juvenile court, at the conclusion of a permanency review hearing, to "order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." **Id.** Such a decision is synonymous with a decision to continue or change the permanency plan goal. **Id.**

To arrive at this decision, the juvenile court must consider the following matters at the conclusion of each permanency review hearing:

> (1) The continuing necessity for and appropriateness of the placement.
>
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
>
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> (4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

[…]

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

[…]

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

> (i) the caregiver is following the reasonable and prudent parent standard; and

> (ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

42 Pa.C.S.A. § 6351(f).

Based on the determinations under Section 6351(f), the juvenile court must then determine the best permanency plan option under 42 Pa.C.S.A. § 6351(f.1), which includes reunification and adoption.

Instantly, the juvenile court conducted a permanency review hearing on March 29, 2023. After hearing the testimony, the court determined that the primary goal of the permanency plan should be adoption and the secondary goal should be reunification. In its detailed Pa.R.A.P. 1925(a) opinion, the court explained its findings and reasons for the goal change:

> The court heard testimony that was positive to some degree. Mother continued residing at the same location and working with the providers. There was concern that Mother was either overusing or being prescribed Adderall by her OB-GYN. Given the vast differences in Mother's levels of Adderall on drug tests, the agency wanted Mother to switch to a psychiatrist who could supervise, diagnose, or implement medication management. Mother did switch to a different physician, however, that physician was a family doctor, not a psychiatrist. The Agency reported working on having collaboration between Mother's doctors on this issue.
>
> The court also heard testimony from an advocate from Catholic Charities, [...], that Adams County Probation contacted her to report that Mother lost her job for not reporting to work for two weeks straight. Mother did find another job and was in her second week of work at the time of the hearing. [The Catholic Charities advocate] reported that visits with the Children went well, but Mother was not always in the moment with the Children, sometimes not

sitting with them for the two-hour visit and constantly thinking about next tasks. [The advocate] testified that on four or five occasions since the last hearing, T.P. broke away from Mother's hand as they were leaving for visits and would run outside into the parking lot. [The advocate] also reported that Mother parents out of guilt as is common for parents with children in foster care. Mother buys the Children gifts to the extent that it has become a problem. [The advocate] indicated that is an issue they have been working on from the beginning, but Mother continues to buy the Children things. Mother has brought gifts to every visit except for two since Christmas. W.P. now expects gifts and asks Mother what did she buy her at visits. Mother has been instructed not to bring presents unless it is a holiday or until further discussion after the passage of some time.

There was also concern regarding Mother's previous boyfriend. As stated above, Mother has not notified anyone that her boyfriend was living in the home and this was viewed as a safety concern. The boyfriend had been in the home during one home visit. Additionally, on January 25, 2023, [the] boyfriend was in the background on a Zoom visit and his computer was observed in the home on February 28, 2023. [The advocate] testified that she pulled up the boyfriend's record on the PA docket in Mother's presence and there were drug charges so there was also concern of possible drug history for him. Mother subsequently indicated that she broke up with [the] boyfriend. However, [the advocate] testified that on March 14, 2023 [(approximately two weeks before the goal change hearing)], Mother told another advocate that "once she gets the kids back," she and [the] boyfriend "are going to discuss their future together." In addition, [the] Agency caseworker […] reported that Mother had three drug tests that were positive for methamphetamines on February 23, 2023, February 24, 2023, and March 3, 2023. This was confirmed by a lab. However, Mother raised concerns because she has had false positives before and these three drug tests were not sent out to ascertain her levels, as is her standing request.

Due to the concerns regarding Mother's parenting, her use of her prescribed Adderall, Mother's focus at visits, and other concerns, the Agency was not able to recommend moving forward with partially unsupervised visits until

Mother had met some of her therapeutic goals. An attorney appearing on behalf of the guardian *ad litem* stated that the guardian *ad litem* recommended against changing the goal because Mother was trying very hard, though acknowledging that "Mother's progress has slowed a bit." Mother's progress has slowed a bit to a point in which the Children had already been in placement for twenty-one months at the time of the permanency review hearing. Additionally, the Agency was still not yet able to recommend partially unsupervised visits, and Mother's compliance and progress were both rated as minimal.

[…]

After twenty-one months, there is a continuing need for placement. The Children are both together in a safe placement that is appropriate and where they will continue to receive therapy. Despite progress in certain areas that necessitated the original placement, Mother's compliance and progress remain minimal and there are still no unsupervised visits.

Given the current status, the current goal of reunification does not seem feasible in the short term. It is clear that reunification is not imminent, although the Children have been in placement for twenty-one months. "The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006)]. The Children are safe and together in their current placement. This court believes that it was in W.P. and T.P.'s best interest to change the primary goal to adoption and the concurrent goal to reunification.

T.C.O. at 6-9; 14-15 (style adjusted).

On appeal, Mother maintains that the record does not support a goal change. She argues that she had made substantial progress under the permanency plan, and that the court's findings to the contrary are without evidentiary support. Mother takes issue with several specific findings,

including the court's questioning of her ongoing Adderall use. On this point, we agree with Mother.

At the subject permanency review in March 2023, the Agency argued that the juvenile court should not expand Mother's visitations – which is to say, the court should delay reunification – because the Agency was still concerned with the Children's safety. Chief among those concerns, were the propriety of Mother's Adderall prescription for ADHD and, somewhat ironically, Mother's inability to focus during the visits. The court agreed with the Agency's position.

We can appreciate that the Agency initially had legitimate concerns that Mother might have been misusing, abusing, or selling the pills. Mother had not always been forthright with the caseworker and service provider; and Mother's sobriety was relatively recent. The imposition of measures to ensure Mother's proper use of the medication would be reasonable. Yet, the concerns were still not allayed even after the court heard testimony during the December 2022 permanency review hearing, wherein the service provider testified that Mother's pills were accounted for. N.T., 12/5/22 at 18-19. During the January 2023 permanency review, the court heard testimony from Mother's drug counselor at the Open Arms Recovery Center and from Mother's probation officer who both testified that they had no concerns regarding the appropriateness of Mother's medication for Adderall. *See* N.T., 1/18/23 at 12; 21-22.

Upon closer inspection of the record, we observe that the Agency was also concerned that the medication was being overprescribed; the Agency even questioned whether Mother had ADHD. *See* N.T., 1/18/23 at 60. The Agency convinced the juvenile court that Mother's diagnosis and treatment plan was dubious, because the prescribing doctor was an OB-GYN. *See* N.T., 3/29/23 at 42-43.

However, the record shows that the prescribing doctor, Dr. Peck, was affiliated with Open Arms Recovery Center and was the doctor who prescribes medications for all the patients. *Id.* at 33-34. Presumably then, Dr. Peck has experience with patients in recovery, specifically Mother's recovery, notwithstanding the fact that she was also an OB-GYN. Still, the Agency insisted that Mother see another doctor, and Mother complied. *Id.* at 43-44. But this second doctor evidently practiced family medicine, and the Agency was still unconvinced that Mother should be taking Adderall. The Agency felt that a psychiatrist would be better suited to treat Mother, because Mother was a recovering addict. N.T., 1/18/23 at 60. The Agency ultimately took the position that Mother should not be entitled to partial visitation until she progressed on certain objectives, including seeing a psychiatrist to evaluate her Adderall usage. *See* N.T., 3/29/23 at 63-64. At the time of the subject permanency hearing in March 2023, the Agency had yet to connect Mother with a psychiatrist.

We are troubled by the vague notion that a parent's adherence to a treatment plan for a properly rendered diagnosis could be grounds for a goal

change. As we are not bound by the juvenile court's inferences, we conclude that there was no basis to doubt the propriety of Mother's diagnosis and treatment other than conjecture.

The real problem with the court's findings, is that a portion of Mother's progress was reduced to a catch-22. To explain, in the months leading up the subject permanency review hearing, reunification turned on the expansion of Mother's visits. On one hand, the juvenile court was particularly concerned with Mother's hyperactive behavior and encouraged Mother to work on it. *See* N.T., 12/5/22, at 62. The Agency also argued that Mother's inability to focus posed safety concerns for the Children, and thus was a barrier to expanded visitation. *See, e.g.,* N.T., 1/18/23, at 42; N.T., 3/29/64. But on the other hand, the Agency questioned Mother's ADHD diagnosis and treatment plan. The Agency directed Mother to seek a third professional opinion, this time by a psychiatrist, before it could recommend expanded visitation. The court agreed.

Perhaps a psychiatrist is the best option for Mother's long-term medication management and treatment, and the juvenile court was free to order further evaluations. But in the meantime, Mother's continued Adderall usage should not have been held against her as a basis to delay the expansion of Mother's visits – which is to say, a reason why the goal should be changed from reunification to adoption. As we discuss *infra*, there were other, valid reasons for the goal change, however the sheer fact that Mother was

prescribed Adderall by the doctor from Open Arms Recovery Center should not have been one of them.

Thus far, we have articulated how our inferences differ from those of the juvenile court, as is permitted by our standard of review. But as our Supreme Court has repeatedly cautioned, adherence to this standard also means that "we are not in a position to make close calls" based on fact-specific determinations:

> Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*R.J.T.*, 9 A.3d at 1190.

With this in mind, we discuss the reasons why we conclude that the juvenile court's decision was proper. The record indicates that Mother's highwater mark occurred around October 2022. At that point, the Children had been in placement for 15 months, but Mother had made significant progress and unsupervised and/or overnight visitation seemed imminent. In its wisdom, the juvenile court determined that a goal change was not in the Children's best interests, notwithstanding the length of their placement. Soon thereafter, however, Mother made a series of choices, which led the court to

conclude that visitation could not be expanded without posing safety risks to the Children. In turn, the court had to reassess Mother's progress and concluded that reunification was no longer feasible in the short term.

First, there was Mother's improper use of a prescription diet pill. Mother was not forthright with the Agency after testing positive. Mother's excuse for taking these pills – the pills belonged to a friend, and she did not realize they were prescription – could seem plausible. But it was not unreasonable that the court would treat Mother's use of the diet pill as a potential safety risk, given Mother's history with addiction. Once the drug screen showed that Mother had taken an unauthorized medication, the court had to reassess the situation and reconsider whether the visits should be expanded. The reassessment took time, and in the interim, the Children had to remain in placement. Moreover, Mother's use of the pill constituted a parole violation, the result of which could have threatened the permanence of any potential reunification.

Second, Mother allowed her boyfriend to be in the home during her visits. A parent's decision to introduce children to their romantic partner is not necessarily problematic. But here, the boyfriend had a criminal history of drug offenses. Given Mother's recent sobriety, it was not unreasonable for the court to question Mother's judgment and again reassess whether reunification could be safely achieved while Mother was involved with this individual. Mother argues that the record does not support the court's finding that the boyfriend lived with Mother. While it was not unreasonable for the

juvenile court to make this inference, whether the boyfriend actually lived in Mother's home is mostly beside the point. Mother was in a relationship with the boyfriend, and he clearly stayed at Mother's home for some measure of time, most notably when the Children were in the home during one of Mother's visits.

Third, Mother tested positive for methamphetamines. Mother argues that the result could be a false positive; indeed, Mother had previously tested positive for methamphetamines only for those results to be deemed negative following a confirmatory process. The positive results in question, however, were confirmed to be positive following that same process. Still, Mother maintains that the confirmed screens could still be false positives, because the Agency failed to ascertain the precise levels of methamphetamines in Mother's system.

This case presents similar facts to those in *Interest of S.C.*, 2023 WL 5345378 (Pa. Super. August 21 2023) (non-precedential decision). There, the mother reasoned that her valid use of Adderall can sometimes present as a false positive for methamphetamines. For support, she cited the testimony of her family doctor. The local child protective services agency disputed that medical opinion by citing its own witness, an expert toxicologist, who testified that Adderall only presents as amphetamines, not methamphetamines. Ultimately, the trial court had the discretion to decide who to believe. We concluded that the trial court did not err when it weighed the testimony of the toxicologist more heavily than that of the mother's family doctor. *Id.* at *7.

Here, we are faced with a similar question. Mother asks us to infer that there is a nexus between Mother's levels of methamphetamines and the accuracy of the confirmation process. We cannot do this, as there is no evidence in the record to clarify why or how the Mother's more recent positive tests were also false positives. We also note that the Agency countered, by arguing that because Mother should not have tested positive for methamphetamines at any level, knowing the precise level is irrelevant to the binary question of whether Mother had an illicit substance in her system. We conclude that the juvenile court did not err or abuse its discretion when it determined that Mother did, in fact, use methamphetamines. In turn, we conclude that the juvenile court did not abuse its discretion when it relied on the confirmed positive tests to determine that a goal change was in the best interests of the Children.[3]

In the event our discussion appears to focus exclusively on Mother's conduct, we reiterate that the primary consideration of dependency proceedings is the safety, permanency, and well-being of the Children. **See** **N.C.**, **supra.** The totality of these bases for the goal change here – the prescription diet pill, the presence of the boyfriend, the positive

_____

[3] Mother's positive tests for methamphetamines was central to both the juvenile court's decision to change the goal, as well as our own decision to affirm. The notion that a dependency case may ultimately turn on a false positive drug screen is distressing. Although we conclude that the record supports the court's finding that Mother tested positive for methamphetamines, we strongly encourage the juvenile court pay close attention to this issue.

methamphetamine screens – supports the juvenile court's determination that expansion of the visits could not be achieved without undue risks to the Childrens safety, that Mother's progress with the permanency plan had to be reassessed, and that reunification was no longer imminent.

We also cannot ignore that the plateau in Mother's progress transpired after the Children had been in placement for 15 months. To be clear, the Juvenile Act does not establish a litmus test that requires a juvenile court to alter the course of reunification, due simply to the amount of time a child has been in placement. However, the Act does alert the juvenile courts to the potential of foster care drift – *i.e.*, mandating courts to query whether the agency has initiated termination proceedings once a child has been in placement for 15 months. *See In re P.Z.*, 11 A.3d 840, 847 (Pa. Super. 2015) (citing *R.J.T.*, 9 A.3d at 1190; 42 Pa.C.S.A. § 6351(f)(9)). Given the potential for foster care drift, juvenile courts are encouraged to utilize concurrent planning early in the case and include adoption as a potential alternative to reunification. *R.J.T.*, 8 A.3d at 1191. "[C]oncurrent planning is encouraged because it both protects the child from foster care drift, by allowing agencies to consider adoptive resources (including kinship care) while keeping alive the potential of reunification." *Id.* (citation omitted). Instantly, the juvenile court kept reunification a firm possibility, as evidenced by the fact that the goal change still constituted concurrent planning – albeit with the primary goal of adoption. Presumably then, Mother had retained access to reunification services during the pendency of this appeal and still had an

opportunity to course correct during the pendency of any subsequent permanency review hearings. *Id.* at 1187 n.9. That notwithstanding, we conclude the juvenile court acted within its broad discretion and changed the permanency goals in this case.

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>11/06/2023</u>